**STUEVE SIEGEL HANSON LLP**
Rachel E. Schwartz
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel:  816.714.7125
Fax:  816.714.7101
schwartz@stuevesiegel.com

*Plaintiffs' Co-Lead and Interim Class Counsel*

*[additional counsel on signature page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UNITED SPECIALTY INSURANCE COMPANY SKI PASS INSURANCE LITIGATION | Case No.: 4:20-MD-02975-YGR<br><br>MDL No. 2975 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ann C. Hoak, John Nevraumont, and Sunit Anandwala ("Plaintiffs") bring this action on behalf of themselves and all other similarly situated persons against Defendant United Specialty Insurance Company ("USIC").  Plaintiffs make the following allegations pursuant to the investigation of counsel, and based upon information and belief, except as to the allegations specifically pertaining to them, which are based on personal knowledge.

## NATURE OF ACTION

1. This is a class action for breach of contract to recover amounts for the loss of use of ski passes insured by USIC.  Plaintiffs' claims and those of the proposed class are supported by the written provisions of the ski pass insurance they purchased from USIC, which are materially the same for all members of the proposed class.

2. Plaintiffs and the proposed class members purchased from USIC ski pass insurance that covers the cost of each insured ski pass against the risk of not being able to use the pass due to the occurrence of a covered peril.  Defendant promised to reimburse Plaintiffs and members of the proposed class for the cost of their ski passes (minus an applicable daily rate or pro-rata reduction for each day that an insured used his or her ski pass during the 2019/2020 ski season).

3. Despite unambiguous language in the insuring agreement, which is fully integrated, USIC breached its promises by failing to pay Plaintiffs and proposed class members when they were prevented from using their ski passes because of the closure of ski resorts due to the COVID-19 pandemic.

4. USIC has caused material harm to Plaintiffs and the proposed class by improperly failing to make payment.

5. On behalf of themselves and a class of similarly situated persons, Plaintiffs seek to recover compensatory damages, as well as declaratory relief.

## PARTIES

6. Plaintiff Ann C. Hoak is a resident of Vail, Colorado.  Ms. Hoak purchased a ski pass for access to the mountain resorts owned and/or operated by Vail Resorts for the 2019/2020 ski season.  She purchased ski pass insurance from USIC with the purchase of her ski pass.

7.      Plaintiff John Nevraumont is a resident of San Leandro, California.  Mr. Nevraumont purchased a ski pass for access to the mountain resorts owned and/or operated by Vail Resorts for the 2019/2020 ski season.  He purchased ski pass insurance from USIC with the purchase of his ski pass.

8.      Plaintiff Sunit Anandwala is a resident of Seattle, Washington.  Mr. Anandwala purchased a ski pass for access to the mountain resorts owned and/or operated by Vail Resorts for the 2019/2020 ski season.  He purchased ski pass insurance from USIC with the purchase of his ski pass.

9.      Defendant USIC is a property casualty insurance company incorporated under the laws of the state of Delaware with its principal place of business in the state of Texas at 1900 L Don Dodson Drive, Bedford, Texas 76021.

### JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

11.     Plaintiffs Ann C. Hoak, John Nevraumont, and Sunit Anandwala originally filed their action in the United States District Court for the District of Colorado (1:20-cv-01152-CMA-GPG).  Venue is proper in the District of Colorado under 28 U.S.C. § 1391 in that Defendant resides in that judicial district and is subject to that court's personal jurisdiction and a substantial portion of the events giving rise to the causes of action occurred in that judicial district.

12.     Without waiving their respective rights to request that their claims be transferred back to the court in which they originally filed pursuant to 28 U.S.C. § 1407 for trial, Plaintiffs who originally filed in the District of Colorado assert that venue is proper in this District for pre-trial multidistrict litigation proceedings under 28 U.S.C. §§ 1391 and 1407 as their actions were transferred to this District as part of coordinated pre-trial multidistrict litigation proceedings.  Without waiving their respective rights to request that their claims be transferred back to the court in which they originally filed pursuant to 28 U.S.C. § 1407 for trial, venue is also proper in this District because Defendant resides in this judicial district and is subject to this Court's personal jurisdiction and a substantial portion of the events giving rise to the causes of action occurred in this judicial district.  Venue is additionally proper in this District

or in the District of Colorado pursuant to the terms of the ski pass insurance policy purchased by Plaintiffs, which is attached as Exhibit A and states in relevant part: "In the event the Company [USIC] fails to pay any amount claimed to be due, the Company, at the insured's request, will submit to a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  All matters arising hereunder shall be determined in accordance with the law and practice of such court."

## FACTUAL BACKGROUND

### The Insurance Industry's Knowledge of and Preparation for Global Pandemics

13.    Health officials and the insurance industry have been preparing for the next global pandemic for decades.  In particular, the outbreak of a novel coronavirus presented a likely risk as COVID-19 (originally named SARS-CoV-2) was preceded by the global spread of two other coronaviruses in only the last 18 years.

14.    Specifically, in February 2003, a new viral respiratory illness called severe acute respiratory syndrome ("SARS"), caused by a coronavirus (SARS-CoV), was first reported in Asia and ultimately infected thousands of people across the globe.

15.    In the years following the SARS outbreak, the Centers for Disease Control ("CDC") analyzed the global response to SARS and discussed the lessons learned from this outbreak, which included that "SARS-CoV can spread rapidly on a global scale through international travel if control measures are not implemented."  Because "[p]atients with SARS can transmit infection to other passengers on conveyances," the CDC found that it was critical that individuals potentially exposed to the virus "postpone travel until they are no longer infectious."[1]

16.    Merely nine years later in 2012, the Middle East Respiratory Syndrome (MERS), another illness caused by a coronavirus (MERS-CoV), spread to 27 countries.

17.    In addition to the more recent threat from coronaviruses, the United States has experienced significant spread of other infectious diseases within its borders in the last 100 years, including four Influenza A pandemics, beginning with the 1918 "Spanish Flu" pandemic that killed more than 600,000 Americans and continuing to the H1N1 pandemic in 2009.

---

[1] https://www.cdc.gov/sars/guidance/e-travel/lessons.html.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

18.     As recently as 2018, during the 100-year remembrance of the 1918 Spanish Flu, the CDC warned of the dramatically increasing risk of global influenza infections, reporting that there was a 30-fold increase in reported novel flu infections from the 1990s to the 2000s.



19.     The CDC further warned that a new virus could be catastrophic because the world is "more crowded, more connected, and the worlds of humans and animals are increasingly converging."[2]

20.     But the threat of a global pandemic is not limited to the flu and coronavirus alone. Additional outbreaks of other infectious diseases in just the last decade have included the Ebola outbreak in West Africa from 2014 to 2016 and the Zika outbreak in Central and South America from 2015-2016.

21.     In 2012, the RAND Corporation published an article exploring the threats to national security, ultimately identifying the five greatest threats: "nuclear proliferation, conflict in the greater

---

[2] https://www.cdc.gov/flu/pandemic-resources/1918-commemoration/pdfs/1918-pandemic-webinar.pdf.

Middle East, water scarcity, pandemics, and climate change . . . . In current circumstances, only pandemics seem to be an existential threat, capable of destroying America's way of life."[3]

22.     In a speech on December 2, 2014, President Barack Obama echoed the risk posed by a pandemic.  He was quoted as saying: "There may and likely will come a time in which we have both an airborne disease that is deadly.  And in order for us to deal with that effectively, we have to put in place an infrastructure—not just here at home, but globally—that allows us to see it quickly, isolate it quickly, respond to it quickly. . . .  So that if and when a new strain of flu, like the Spanish flu, crops up five years from now or a decade from now, we've made the investment and we're further along to be able to catch it."[4]

23.     Not surprisingly, the potential insurance risk posed by an unforeseen global pandemic was well known to the insurance industry well before the COVID-19 pandemic.  For example, a catastrophic modeling company in the insurance industry published an article in March 2018 on the 100th anniversary of the 1918 Spanish Flu pandemic that was intended to "provide insights for today's insurers on how they can better prepare for such an event."  The article noted: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community.  In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[5]

24.     The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, proactively addressed the risk to the insurance industry from widespread viruses and diseases with its 2006 announcement of the submission of an "Exclusion of Loss Due to Virus or Bacteria."  In the Exclusion, the ISO noted that many insurance policies already contained an exclusion for pollution contamination, but such an exclusion did not necessarily extend to claims related to viruses or bacteria.  The ISO referenced different types of viral and bacterial risks, including listeria, rotavirus,

---

[3] https://www.rand.org/content/dam/rand/pubs/occasional_papers/2012/RAND_OP360.pdf.

[4] https://obamawhitehouse.archives.gov/the-press-office/2014/12/02/remarks-president-research-potential-ebola-vaccines.

[5] https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

SARS, influenza (such as avian flu), legionella and anthrax.  As the ISO stated: "The universe of disease-causing organisms is always in evolution."[6]

25.     The proposed exclusion stated in relevant part: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."  *Id.*

26.     Accordingly, since 2006, insurers have had the opportunity to incorporate – and many have incorporated – this standard virus exclusion in their policies in an effort to avoid covering losses due to viruses like COVID-19.

27.     In fact, USIC has included virus exclusions in its other policies.  For example, in one such policy, USIC included an endorsement that says in bold, all capital letters: "EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA."  The specific exclusion stated that USIC "will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease."

28.     USIC could have, as it has done before, specifically exclude losses due to viruses in its ski pass insurance policy.  USIC did not.

29.     While USIC maintains in this lawsuit that it never intended to provide coverage for resort closures related to the COVID-19 pandemic, the 2021/2022 Epic Pass Coverage Refund Policy Terms and Conditions now specifically state that the "occurrence of a disease, epidemic, or pandemic, including the ongoing COVID-19 pandemic," makes an Epic Pass holder eligible for a refund if the resort is closed for seven or more consecutive days.[7]

### The Epic Pass and Epic Pass Insurance

30.     Defendant USIC provides ski pass insurance whereby it promises its insureds coverage against loss of use of their ski passes.

31.     Vail Corporation d/b/a Vail Resorts Management Company ("Vail Resorts") operates 33 ski resorts throughout the United States.  Vail Resorts sells "Epic Passes" promising access to skiing and

---

[6] https://www.propertyinsurancecoveragelaw.com/wp-includes/ms-files.php?file=2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[7] https://www.epicpass.com/info/epic-coverage-terms-and-conditions.aspx.

snowboarding at its resorts. Consumers can purchase different types of Epic Passes: (1) annual passes for prices generally ranging from $319 to $979; (2) weekly passes for prices generally ranging from $391 to $766; or (3) day or multi-day passes for prices generally ranging from $67 to $766.

32. To induce consumers to purchase Epic Passes well in advance of the ski season, and to mitigate the risk that consumers may be unable to realize the full use of their Epic Passes, USIC ski pass insurance was advertised and directly offered to Vail Resorts' customers at the time they purchased their Epic Passes.

33. Upon information and belief, Vail Resorts sold hundreds of thousands of Epic Passes for the 2019/2020 ski season.

34. Upon information and belief, thousands of consumers purchased USIC ski pass insurance on their Epic Passes.

35. The website for Epic Passes identified pricing for ski pass insurance as follows, based on the type of Epic Pass purchased:

| Pass Type | Adult/Teen | Child |
|---|---|---|
| Epic Pass | $32 | $22 |
| Military Epic Pass – Active/Retired | $17 | N/A |
| Military Epic Pass – Active/Retired Dependent | $17 | $12 |
| Military Epic Pass – Veteran | $27 | N/A |
| Military Epic Pass – Veteran dependent | $27 | $17 |
| Epic Local Pass | $27 | $17 |
| Epic Day Pass | $27 | $17 |
| Summit Value Pass | $27 | $17 |
| Keystone Plus Pass | $17 | $12 |
| Park City Youth Pass | $17 | $12 |
| Tahoe Local Pass | $27 | $17 |
| Tahoe Value Pass | $17 | $12 |
| Kirkwood Pass | $27 | $17 |
| Afton Alps Pass | $17 | $17 |

| | | |
|---|---|---|
| Mt. Brighton Pass | $17 | $12 |
| Wilmot Pass | $17 | $12 |

### Plaintiffs Purchased Epic Pass Insurance

36.     Plaintiffs purchased Epic Passes providing them access during the 2019/2020 ski season to the mountain resorts owned and/or operated by Vail Resorts.

37.     Plaintiffs also purchased ski pass insurance from USIC for their 2019/2020 Epic Passes. A true and accurate copy of the "Certificate of Season Ski Pass Insurance" ("Certificate") is attached hereto as Exhibit A and is incorporated herein by reference.

38.     The Certificate identifies USIC as the insurer of "SEASON SKI PASS INSURANCE COVERAGE UNDER MASTER POLICY NUMBER: EYHBDISP0317." The Certificate further provides: "This is to certify that the undersigned has arranged insurance as hereinafter specified and underwritten by United Specialty Insurance Company."

39.     The Certificate is the "record of coverage under the plan" for each purchaser of ski pass insurance through USIC.

40.     Plaintiffs are owners of ski pass insurance from USIC on the Epic Passes they purchased from Vail Resorts for the 2019/2020 ski season.  Their ski pass insurance was in force at the time of the alleged loss.

41.     USIC is the effective and liable insurer of Plaintiffs' Epic Passes for the 2019/2020 ski season.  Likewise, USIC is the effective and liable insurer of passes purchased by persons meeting the class definition (the "Class").

### Terms of the Epic Pass Insurance

42.     The terms of the ski pass insurance purchased by Plaintiffs and members of the proposed Class are evidenced in the Certificate.  The terms of the ski pass insurance are not subject to individual negotiation and are materially the same for all insureds who purchased USIC ski pass insurance, including all Plaintiffs.

43.     USIC's ski pass insurance states: "We will provide insurance under the Master Policy in consideration of your payment of the Premium."

44.     The Certificate states:

**EFFECTIVE DATE OF COVERAGE**: This insurance will be effective immediately upon acceptance by us of the Premium and shall remain in effect until the last day of the Ski/Snowboard Season or the date upon which ski operations are ceased due to an unforeseen event, whichever is earlier.

45. The Certificate provides:

**PROPERTY INSURED AND COVERAGE LIMITS**: We cover the Season Ski Pass Cost you paid.  We cover you against the risk of not being able to use your Season Ski Pass due to a covered peril.  We will reimburse you for the Season Ski Pass Cost minus the applicable Daily Rate or Pro-Rata reduction (for the Epic Day Pass) for each day (or portion thereof) that you have used your Season Ski Pass during the Ski/Snowboard Season.

46. The Certificate defines "Season Ski Pass" as follows:

**SEASON SKI PASS** – means any lift ticket access pass for multiple day usage throughout the duration of the Ski/Snowboard Season.

47. The Certificate defines the "Ski/Snowboard Season" as follows:

**SKI/SNOWBOARD SEASON** – the period starting on October 15, 2019 and ending on April 15, 2020.

48. The Certificate has a termination clause that states:

**TERMINATION OF INSURANCE**: This insurance shall automatically terminate without notice to you on the last day of the Ski/Snowboard Season.

49. The Certificate defines "Season Ski Pass Cost" as follows:

**SEASON SKI PASS COST** – Means the purchase price of the Season Ski Pass.

50. The Certificate defines "Daily Rate" as follows:

**DAILY RATE** – means $95 per day for an adult pass (age 13 and up) at all Destination Resorts except; $50 per day at Stevens Pass, Okemo, Stowe and Sunapee; $35 per day at Afton Alps, Mt. Brighton and Wilmot Mtn.  **DAILY RATE** for a child pass (age 12 and under) is $35 per day at all Destination Resorts except $15 per day at Afton Alps, Mt. Brighton and Wilmot Mtn.  The DAILY RATE does not apply to Epic Day Pass.  Usage reduction for Epic Day pass will be pro-rated for each usage day and if all days have been used there is no refund.

51. The Certificate defines "Covered Peril," in relevant part, as follows:

**PERILS INSURED AGAINST**: Subject to the Exclusions and Coverage Limits, the Insured has coverage against Loss of use of your Season Ski Pass if caused by any one of the following unforeseen perils ***occurring after the effective date of coverage:***

     a)  Sickness, Injury or death of you or a Family member; …

e) you are subpoenaed, required to serve on a jury, hijacked, **<u>quarantined</u>** or your travel visa is denied; …

(emphasis added).

52. The Certificate defines "Loss" as follows:

**LOSS** – means your inability to use your Season Ski Pass due to an unforeseen event, occurrence or circumstance.

53. The Certificate states:

**VALUATION:** The value of the Season Ski Pass will be determined at the time of Loss and will be the Season Ski Pass Cost minus the applicable Daily Rate for each day (or portion thereof) that you have used of your Season Ski Pass during the Ski/Snowboard Season.

54. Under the heading "**EXCLUSIONS**," the Certificate states: "We do not cover any Loss caused by or resulting from" a lengthy list of events and actions. There are no applicable exclusions for viruses, pandemics, related government and health orders and directives, or actions taken by Vail Resorts, independently or pursuant to such government and health orders and directives. USIC could have but chose not to exclude losses related to quarantines caused by viruses, pandemics, government and health orders and directives or actions taken by Vail Resorts in response to viruses, pandemics, and/or government health orders and directives.

55. Some of the Perils Insured Against, such as a claim based on "Sickness," require a claimant to provide "certificat[ion] by a Physician at the time of Loss." There is no such requirement in the contract for a claim based on quarantine.

**A Quarantine Includes Those Measures Designed to Exclude Individuals to Prevent the Spread of a Disease**

56. Although USIC included definitions for many terms in the Certificate, USIC could have but chose not to include a definition for the word "quarantined."

57. The term "quarantine" is commonly understood to mean: "to detain in or exclude by quarantine," "to isolate from normal relations," "a restraint upon the activities or communication of persons . . . designed to prevent the spread of disease," "the situation of being kept away from others to prevent a disease from spreading," "to exclude, detain, or isolate for political, social, or hygienic reasons," and "a system of measures maintained by governmental authority at ports, frontiers, etc., for preventing the spread of disease." *See* https://www.merriam-webster.com/dictionary/quarantine.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

58.     Wikipedia defines quarantine as "a restriction on the movement of people, animals and goods which is intended to prevent the spread of disease or pests."  Wikipedia goes on to state that in modern history, "State governments generally relied on *cordon sanitaire* as a geographic quarantine measure to control the movement of people into and out of affected communities.  During the 1918 influenza pandemic, some communities instituted protective sequestration (sometimes referred to as 'reverse quarantine') to keep the infected from introducing influenza into health populations.  Most Western countries implemented a range of containment strategies, including isolation, surveillance, and the closure of schools, churches, theatres, and public events. . . . During the COVID-19 pandemic, multiple government actors enacted quarantines in an effort to curb the rapid spread of the virus. Quarantine-like restrictions on movement included curfews and restrictions variously described as stay-at-home         orders,         shelter-in-place         orders,         shutdowns         or         lockdowns." https://en.wikipedia.org/wiki/Quarantine.

59.     Quarantine by exclusion is not a new phenomenon, but is one that dates back to the early 1900s when dealing with communicable diseases including mumps and measles.  *See, e.g.*, Jason Waterman & William Fowler, Public Health Laws and Regulations Adopted During 1924, Supplement No. 51, at 34 (1925) ("Measles . . . Quarantine: Exclusion of nonimmune contacts from school, from public gatherings, and from contact with children, for 15 days from the date of last exposure. … Mumps … Quarantine: Exclusion of nonimmune contacts from school, from public gatherings, and from contact with children, for 25 days from date of last exposure.").[8]

60.     Geographic quarantines have been commonly used in the United States during periods of pandemics, including yellow fever, to exclude individuals from entering a defined geographic area.[9]

---

[8]https://books.google.com/books?id=sHPYDBLLR28C&pg=PA34&lpg=PA34&dq=quarantine+as+exclusion&source=bl&ots=d9rcrX7yAq&sig=ACfU3U0gi4YvIUFWIBsnONuzjNeX6UW5iA&hl=en&sa=X&ved=2ahUKEwjfvcGkg9vvAhWTHc0KHfNxAvI4qgEQ6AEwCXoECAcQAw#v=onepage&q=quarantine%20as%20exclusion&f=false.

[9] *See, e.g.,* Polly Price, *Epidemics, Outsiders, and Local Protection: Federalism Theater in the Era of the Shotgun Quarantine*, J. Constitutional Law, Vol. 19:2, 371 (Dec. 2016), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=1615&context=jcl ("From the 1870s through the first decade of the twentieth century, local governments throughout the South defended their towns against epidemic disease by imposing a form of quarantine by martial law, popularly known as the 'shotgun quarantine.'  Facing the annual terror of yellow fever, armed men guarded their towns to

61.    These types of geographic quarantines were so prevalent that insurance companies began to incorporate specific exclusions related to violations of these geographic quarantines into insurance policies.  "Yellow fever was such a prominent annual risk that life insurance companies included a standard clause voiding the policy if the insured traveled below a 'yellow fever line,' a geographic demarcation that included the entire southern region . . . .  Policy-holders who died of yellow fever forfeited any claim unless they had previously paid an additional amount for a 'southern waiver' for yellow fever."  *See* Price, *Epidemics, Outsiders, and Local Protection*, at 370.

62.    The concept of quarantine by exclusion is expressly included in the federal statutes: "Quarantine means the separation of an individual or group reasonably believed to have been exposed to a quarantinable communicable disease, but who are not yet ill, from others who have not been so exposed, to prevent the possible spread of the quarantinable communicable disease.  42 C.F.R. § 70.1.

63.    As the above definitions indicate, "quarantine" is commonly understood to be associated with measures aimed at the restraint of activities of persons to prevent the spread of a disease.  In fact, among the several definitions, both "archaic and current," "the currently most often found" meaning of "quarantine" is "restraint upon the activities or communication of persons . . . designed to prevent the spread of disease."  www.merriam-webster.com/words-at-play/coronavirus-words-guide/self-quarantine.

64.    Where there is uncontrolled and large-scale community spread, as in the case of a pandemic, individuals may be quarantined through a number of measures.  Those measures can include quarantine by either "detainment" as well as "exclusion."  *See* https://www.merriam-webster.com/dictionary/quarantine ("to detain in *or exclude by* quarantine" (emphasis added)).  Thus, restricting access to areas where individuals may otherwise have the right to publicly gather is a "quarantine" under well-accepted definitions and meanings of that term.

---

prevent the entry of persons from anywhere yellow fever might be present."); *see also* Polly Price, *Do State Lines Make Public Health Emergencies Worse? Federal Versus State Control of Quarantine*, 67 Emory L. J. 491, 497 (2018), https://scholarlycommons.law.emory.edu/cgi/viewcontent.cgi?article=1058&context=elj ("A quarantine may also cover a geographic area.  A prohibition against persons entering or leaving a defined boundary is an example of a geographic or area quarantine.  Known as a *cordon sanitaire*, this 'zone' quarantine is a barrier implemented to stop the spread of infectious disease, usually by a guarded line.").

65.     In addition to dictionary definitions, numerous publications in recent decades demonstrate that modern usage of the term "quarantine" encompasses the potential for large-scale or community-wide measures.  This is particularly so where modern travel allows people to traverse the globe with relative ease, thereby exposing them to contact with other persons in a way unprecedented in human history.  "The increasing interconnectedness of the world's inhabitants has meant our potential exposure to highly communicable pathogens from distant lands can occur in less than twenty-four hours."[10]

66.     As the COVID-19 crisis has reconfirmed, measures aimed at singling out individuals are replaced, when necessary, with measures excluding large groups of people, even entire cities, to prevent the spread of disease.  In other words, "quarantine" is not a "one-size-fits-all."[11]

67.     Indeed, the threat of a potential pandemic in recent decades has merely highlighted the potential necessity of community-wide quarantine exclusions in the face of spread of an infectious disease, or even an unforeseen pandemic.  Thus, while "quarantine" measures at the community level may be rare, it does not mean they are outside of the common understanding of the term.

68.     This modern understanding of the term is encapsulated in a publication authored by several doctors with the CDC on the heels of the SARS outbreak nearly 18 years ago:

> [Q]uarantine—when properly applied and practiced according to modern public health principles—can be a highly effective tool in preventing the spread of contagious disease . . . . Quarantine as it is now practiced is a public health tool and a collective action for the common good.  Today's quarantines are more likely to involve a few people exposed to contagion in a small area, such as on an airplane or at a public gathering, and only rarely are applied to entire cities or communities.  The main goal of modern quarantine is to reduce transmission by increasing the "social distance" between persons; that is, reducing the number of people with whom each person comes into contact . . . . Quarantine activities can range from only passive or active symptom monitoring or short-term voluntary home curfew, all the way to cancellation of public gatherings, closing public transportation, or, under extreme circumstances, to a *cordon sanitaire:* a barrier erected around a geographic area, with strict enforcement prohibiting movement in or out.

---

[10] *See, e.g.,* Charles Vidich, *Germs at Bay*, ABC-CLIO, xv (Jan. 19, 2016), https://books.google.com/books?id=xwsVEAAAQBAJ&pg=PA353&lpg=PA353&dq=%22quarantine+by+exclusion%22&source=bl&ots=gTXsxlPZaa&sig=ACfU3U3Dvgh2HccqCkmgn-zfNbcd-amR-g&hl=en&sa=X&ved=2ahUKEwirjrDv_trvAhURac0KHaSWA_IQ6AEwBHoECAEQAw#v=onepage&q=%22quarantine%20by%20exclusion%22&f=false.

[11] *Id.* at xvi.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

Institute of Medicine 2004, *Learning from SARS: Preparing for the Next Disease Outbreak: Workshop Summary*, Washington, D.C.: The National Academies Press, www.ncbi.nlm.nih.gov/books/NBK92450/ (emphasis in original).

69.    Other publications similarly demonstrate that "quarantine" is commonly understood as encompassing measures both large-scale (aimed at thousands, if not millions of people) and include the concept of exclusion.  *See, e.g.*, Lauran Neergaard, *What would modern quarantine look like?*, The Seattle Times, Oct. 11, 2005, www.seattletimes.com/nation-world/what-would-modern-quarantine-look-like/ (last visited April 12, 2021) ("'Quarantine' means restricting the movement of still healthy people who may have been exposed to an infectious disease, in case they're carrying it;" "quarantine authority involves . . . stopping interstate spread;" and "[d]rafts of the pandemic plan make clear that affected communities probably would close schools, shut down large gatherings and restrict travel"); *see also* Richard Schabas, *Is the Quarantine Act relevant?*, Canadian Medical Association, June 19, 2007, www.ncbi.nlm.nih.gov/pmc/articles/PMC1891118/ (last visited April 12, 2021) ("Quarantine, broadly defined, means the 'restrictions placed on the entrance to and the exit from the place or premises where a case of communicable disease exists.' In practice, there is an important distinction between quarantine and case-specific measures."); Charles Vidich, *Germs at Bay*, ABC-CLIO, xvi, 11 (Jan. 19, 2016)[12] ("Quarantine should never be considered as simply a form of confinement.  Innovations in modern medicine, engineering, and behavioral science research have expanded the principles of quarantine to also encompass what might be called 'pathogen quarantine' or 'pathogen exclusion' strategies . . . . American quarantine practice has passed through five distinct stages . . . through which the concept of quarantine has evolved . . . [including] use of the 'quarantine net' to stop migration . . . quarantines of exclusion[.]").

70.    In some instances, the concept of "quarantine by exclusion" has been referred to as a "modified quarantine" (involving "less stringent restrictions on movement") as compared to "absolute

---

[12]https://books.google.com/books?id=xwsVEAAAQBAJ&pg=PA353&lpg=PA353&dq=%22q uarantine+by+exclusion%22&source=bl&ots=gTXsxlPZaa&sig=ACfU3U3Dvgh2HccqCkmgn-zfNbcd-amR-g&hl=en&sa=X&ved=2ahUKEwirjrDv_trvAhURac0KHaSWA_IQ6AEwBHoECAEQAw#v=onepag e&q=%22quarantine%20by%20exclusion%22&f=false.

quarantine" ("isolation, usually for the maximum incubation period").  *Id.*; *see also* www.lawinsider.com/dictionary/quarantine-modified (last visited April 12, 2021) ("Quarantine, modified means a selective, partial limitation of freedom of movement or actions of an individual or individuals who do not have signs or symptoms of the infection but have been exposed to, or are reasonably suspected to have been exposed to, a communicable disease of public threat.  Modified quarantine may be designed to meet particular situations . . . .").

71.     Perhaps the most applicable example offered for a "modified quarantine," or "quarantine by exclusion," is the situation where children are excluded from school due to ongoing spread of the virus, with which many families have become well-familiar over the past year.  *See* www.encyclopedia.com/medicine/divisions-diagnostics-and-procedures/medicine/quarantine (lasted visited April 12, 2021) ("Quarantine is defined as a restriction of the activities of healthy persons . . . who have been exposed to a communicable disease.  The aim is to prevent transmission of the disease from potentially infected persons to healthy persons . . . . Quarantine can take two forms . . . modified quarantine, which involves selective or partial limitation of movement, based on known differences in susceptibility.  Examples of a modified quarantine are the exclusion of children from school . . . .").

72.     Another form of quarantine is a "reverse quarantine," which has been recommended in Idaho as a critical way of combating a pandemic outside of a formal government mandate.  "If a pandemic starts, the best way to deal with the problem is to protect as many healthy people as possible until they can be immunized against the infection or until the infection risk subsides.  Quarantines work if you can identify individuals who are infected before they spread infection to others.  With pandemic influenza, it is nearly impossible to have an effective quarantine because of the incubation period (see above).  Rather than trying to identify sick people and keeping them away from the healthy population (quarantine) we recommend an exact opposite approach—namely, sequestering healthy people from the outside world (reverse quarantine).  Quarantines are legally binding and imposed by the health department.  A reverse quarantine must be instigated by an individual or groups of individuals voluntarily (self imposed)."[13]

---

[13] Preparing for a Pandemic Influenza Outbreak: The Self-Imposed Reverse Quarantine (SIRQ) Plan (2006),
https://www.byui.edu/Documents/Admin_Offices/Facilities%20Management/Security%20and%20Safety/Preparing%20for%20an%20Influenza%20Pandemic.pdf.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

73.     Many states expressly incorporate this form of quarantine.  For example, Colorado, where Vail Resorts is headquartered and many of Vail Resorts' ski areas are located, includes the use of geographic/reverse quarantines as part of its Pandemic "Toolbox" to help control and prevent the spread of a pandemic.  *See* Pandemic Influenza: Quarantine, Isolation and Social Distancing, Toolbox for Public Health and Public Behavioral Health Professionals, Colo. Dept. of Human Servs., at 46, http://www.realisticpreparedness.com/downloads/PanFluQuarantineIsolation.pdf  ("A  geographic isolation (by force if necessary) of a specific area.  This may be used to contain an outbreak or as a reverse quarantine to keep disease out of an uninfected area.").

74.     Mass, community-wide exclusion measures as a form of "quarantine" are even encompassed in the federal statutes.  For example, in describing the "Quarantine and Inspection" duties of the surgeon general, 42 U.S.C. § 265 provides for the "Suspension of entries and imports from designated places to prevent spread of communicable diseases" and states:

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country *there is serious danger of the introduction of such disease* into the United States, *and that this danger is so increased by the introduction of persons* or property from such country that *a suspension of the right to introduce such persons* and property *is required in the interest of the public health*, the Surgeon General, in accordance with regulations approved by the President, *shall have the power to prohibit, in whole or in part, the introduction of persons* and property from such countries or places as he shall designate *in order to avert such danger*, and for such period of time as he may deem necessary for such purpose.

(emphasis added).

75.     Even in California, regulations enacted in response to COVID-19 included business-led "exclusion" of employees from the workplace as a result of exposure to the virus.  *See, e.g.*, 8 CCR 3205.1(c) ("Exclusion of COVID-19 cases.  Employers shall ensure COVID-19 cases and employees who had COVID-19 exposure are excluded from the workplace."); Executive Order N-84-20 ("WHEREAS the ETS *directed employers to exclude from the workplace* for 14 days *those employees who have been exposed* to COVID-19, *reflecting the then-current guidance* of the Centers for Disease Control and Prevention (CDC) and the California Department of Public Health (CDPH) *on quarantining* after being exposed to COVID-19." (emphasis added)).

76.     These measures for exclusion from businesses, as set forth by the governor of California by executive order, are commonly understand as "quarantine" measures.  *See,  e.g.*,

16

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

https://www.fisherphillips.com/news-insights/california-governor-loosens-cal-osha-covid-19-quarantine-rules.html ("Governor Gavin Newsom just issued an Executive Order that potentially reduces *the quarantine exclusion period* for COVID-19 exposed employees. . . . Yesterday's action . . . reduces the amount of time employers are required *to exclude* COVID-19 exposures . . . ." (emphasis added)); https://www.jdsupra.com/legalnews/covid-19-laws-impacting-california-9633402/ ("Exclusion from Workplace: Employees who are considered to be a positive COVID-19 case and those who have had close contact with a positive COVID-19 case *must be excluded from the workplace* until the established return to work criteria has been satisfied . . . .  See below for additional information about the length of *quarantine*." (emphasis added)).

77.  In New York, Governor Cuomo ordered nonessential businesses to send their workers home, stating: "We're all in quarantine now.  We're all in various levels of quarantine and it's hard."[14]

78.  Where it is well-understood that a "quarantine" can be achieved by exclusion (i.e., "the situation of *being kept away from* others to prevent a disease from spreading," "*to exclude*, detain, or isolate for political, social, or hygienic reasons," etc.), and its most common used definition embraces "a restraint upon the activities or communication of persons . . . designed to prevent the spread of disease," the fact that the world has not often been faced with such prolific world-wide spread of an infectious disease necessitating community-wide measures does not undermine the common meaning.

**Vail Resorts Exclude Epic Pass Holders to Help Prevent the Spread of the Virus**

79.  The President of the United States, and state and local authorities throughout the United States, including the locations where ski resorts owned by Vail Resorts operate, issued various orders and directives related to the COVID-19 pandemic, and limiting human contact and restricting travel and activities.[15]

---

[14] https://www.cnbc.com/2020/03/20/new-york-gov-cuomo-orders-100percent-of-non-essential-businesses-to-work-from-home.html?fbclid=IwAR3DWQkdoQMo_zLTQyAOMihr_90IHgjq69ynrSPHuJqkwWoTK_t7EkBlM-g.

[15] While many of the restrictions placed on individuals have been called "stay-at-home" or "shelter-in-place" orders rather than "quarantine" measures, perhaps to make the imposed restrictions on interaction and movement more palatable to the American public, this does not mean such restrictions do not include well-understood characteristics of "quarantine" measures.  Indeed, such measures are

---

17

80.     For instance, Eagle County, Colorado—where Plaintiff Hoak resides and the location of the Vail Ski Resort owned by Vail Resorts—filed a local disaster emergency declaration with the state of Colorado on March 7, 2020, in response to the arrival of COVID-19 in that county.  The declaration stated in part that "the Coronavirus, a/k/a COVID-19, constitutes a public health emergency of International concern and has been determined to be present in Eagle County and can be anticipated to spread significantly, requiring emergency preparation and execution of procedures to minimize its impact and protect the health safety and welfare of District Constituents . . . ."

81.     Likewise, the Governor of Colorado, like the governors of other states and representatives of local governments, municipalities, and counties around the United States, declared a state of emergency as a result of COVID-19, and on March 11, 2020, issued executive order D 2020 003, declaring a disaster emergency due to the presence of COVID-19 in Colorado.

82.     This executive order declared a "state of disaster emergency due to the presence of coronavirus disease 2019 (COVID-19) in Colorado, and authoriz[ed] response activities associated with the disaster emergency to enable State agencies to coordinate response, recovery, and mitigation efforts." The order stated that this order was made "not only to prevent the spread of the virus, but also to assure both Coloradans and visitors to our State that we are minimizing risks."

83.     On March 12, 2020, in response to the community spread of COVID-19, the Eagle County Public Health Department, like the health departments of states, municipalities, and counties around the United States, issued a public health order imposing restrictions on social gatherings.

84.     On March 14, 2020, having "been closely tracking every new development related to coronavirus (COVID-19) and hav[ing] been in constant contact with local health officials for guidance," Vail Resorts announced it would "*suspend* the operations of all North American mountain resorts and retail stores beginning Sunday, March 15, 2020 through Sunday, March 22, 2020 and we use that time to

---

readily acknowledged as such in other countries.  For example, in the Philippines, various levels of "quarantine" have been implemented by the government, including a "general community quarantine," which is "less stringent" than other quarantine measures implemented by the government and includes public transportation and businesses operating at reduced capacity, among other measures.  *See, e.g.,* https://en.wikipedia.org/wiki/COVID-19_community_quarantines_in_the_Philippines#General_community_quarantine_(GCQ).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

reassess our approach for the rest of the season."  Update on Vail Resorts Operations from CEO Rob Kratz, https://www.snow.com/info/covid-19-update.aspx (emphasis added).

85.     On March 14, 2020, the Governor of Colorado issued Executive Order D 2020 004 ordering the closure of downhill ski resorts "due to the presence of COVID-19 in the State of Colorado." The Executive Order recognized that "COVID-19 is a highly contagious viral disease that has spread throughout many of our communities.  Public health officials have concluded that disease control measures aimed at specific individuals or groups are no longer sufficient to contain the further spread of the virus."

86.     Because these public health disease control measures were insufficient, the Governor directed "downhill ski resorts to suspend operations for one week to slow the spread of COVID-19 and conserve medical resources in our mountain communities."

87.     In that same Order, the Governor acknowledged that Vail Resorts had that same day suspended its operations for one week and the Governor "applaud[ed]" Vail's "willingness to prioritize public health and safety during these difficult times."

88.     On March 17, 2020, Vail Resorts made the decision to close its North American resorts for the entirety of the 2019/2020 season "amidst the continued challenges associated with the spread of coronavirus (COVID-19)."  Vail Resorts to Close North American Resorts for the 2019-20 Ski Season (Mar. 17, 2020), http://investors.vailresorts.com/news-releases/news-release-details/vail-resorts-close-north-american-resorts-2019-20-ski-season.

89.     Vail Resorts explained it made its decision "[g]iven the escalating concerns surrounding the global spread of COVID-19 and the potential impact that continuing to operate our resorts would have on our community medical systems," and acknowledged its efforts to "work to contain the spread of COVID-19 with a focus on the health and safety of our employees, guests and communities."  Vail Resorts Provides Updated Commentary on COVID-19 Impact (Mar. 18, 2020), http://investors.vailresorts.com/news-releases/news-release-details/vail-resorts-provides-updated-commentary-covid-19-impact.

**Plaintiffs' Losses**

90.   Coverage under the Certificate was in effect at the time Vail Resorts closed.  In other words, the initial suspension of Vail Resorts' properties and subsequent closure to prevent the further spread of COVID-19 did not terminate insurance coverage under the Certificate.

91.   The Certificate's "Termination of Insurance" provision states that coverage terminates "the last day of the Ski/Snowboard Season," which is defined as "ending on April 15, 2020."  The "Termination of Insurance" provision is silent as to insurance coverage terminating under the Certificate for any other reason.

92.   The "Effective Date of Coverage" provision provides, in relevant part, that the ski pass insurance "shall remain in effect until . . . the date upon which ski operations are ceased due to an unforeseen event."  The Certificate does not define any of the terms used in this phrase.

93.   By Vail Resorts' own statements, ski operations did not "cease" as of March 15, 2020. Instead, Vail Resorts publicly stated on March 14, 2020, that operations were "suspended" from March 15, 2020 through March 22, 2020.

94.   But as of March 14, 2020, Plaintiffs experienced losses pursuant to the Certificate because as of that date all ski pass holders were unable to use their Epic Passes due to an "unforeseen event, occurrence or circumstance," as the Certificate states.  The "valuation" of the loss is defined within the Certificate and is "determined at the time of Loss," which is as of March 14, 2020 when Vail Resorts declared that operations would be suspended as of the next day.

95.   In addition, even after Vail Resorts' March 14th announcement, Vail Resorts' mountain resorts could still support "ski operations."  The term "operation" is defined as "the quality or state of being functional or operative."  Merriam-Webster, https://www.merriam-webster.com/dictionary/operation.  Because Vail Resorts' properties still had the quality or state of being functional or operative for skiing or snowboarding, ski pass insurance coverage under the Certificate did not prematurely terminate when Vail Resorts' properties were closed.

96.   Pursuant to the terms of the Certificate, Vail Resorts does not have an unfettered right to close their properties and then claim that such a closure triggers the end of coverage under the Certificate. Such an interpretation renders part of the Certificate wholly illusory.  For example, the Certificate

expressly provides coverage when a "Destination Resort closes indefinitely due to an unforeseen event like a Natural Disaster." But if a Natural Disaster were an "unforeseen event," then coverage under the Certificate would no longer be in effect because of the occurrence of the Natural Disaster.

97.     Here, Vail Resorts cannot end coverage under the Certificate by voluntarily suspending and then closing its resorts to avoid compensating Epic Pass holders who were quarantined away from the resorts. This interpretation of the "Effective Date of Coverage" provision is not in accord with the meaning a layperson would ordinarily attach to this phrase and would frustrate the objectively reasonable expectations of the insured.

98.     At a minimum, the phrase "shall remain in effect until . . . the date upon which ski operations are ceased due to an unforeseen event" is ambiguous and must therefore be construed against the insurance company drafter, USIC.

99.     As a result of the closure, which was intended to prevent the spread of the COVID-19 virus, Plaintiffs were excluded from entering upon and using the facilities of any of Vail Resorts' properties and deprived of the use of their Epic Passes.

100.    Vail Resorts' decision to shut down its resort locations and exclude its passholders was a "quarantine"—given the commonly understood meaning of that term—as it was a measure aimed at restricting access of Epic Pass holders from publicly gathering at resort locations to prevent further spread of COVID-19.

101.    Plaintiffs, who had intended to continue to make use of their Epic Passes, were excluded from Vail Resorts when their Epic Passes still had value remaining.

102.    As set forth in the Certificate, this was a Peril Insured Against by USIC and Plaintiffs are entitled to receive from USIC payment of the cost of their Epic Passes less the applicable "Daily Rate" for each day that they used their Epic Passes during the ski/snowboarding season.

### USIC Denies Coverage

103.    USIC is on notice of the COVID-19 pandemic and Vail Resorts' closure of ski resorts throughout North America, which has prevented access to Vail Resorts' ski resorts to all Epic Pass holders.

104.    USIC is on notice of Plaintiffs' and the Class's loss of use of their Epic Passes.

105.    Although the Certificate identifies coverage for loss of use of Epic Passes for Plaintiffs and the proposed Class under the circumstances here, USIC has stated through its agents that it will not provide coverage for the March 14, 2020, closure of Vail Resorts' ski resorts.

106.    Through its agents, USIC therefore has confirmed that any filing of notice of loss related to the March 14, 2020, closure of Vail Resorts' ski resorts would be futile.

107.    Specifically, the Certificate provides that any notice of loss should be made to American Claims Management ("ACM") by mail, email, or by report online via smartphone or computer at https://www.acmclaims.com/secureforms2/claim/vail.

108.    That link previously opened a form that stated at the top:

Reminder

**There is no coverage under the insurance policy for Resort Closure.  We suggest you go to the 2019/2020 Pass Holder Credit section of epicpass.com for more information prior to filing a claim.**

(emphasis and color original).

109.    Likewise, Vail Resorts informed Epic Pass purchasers that ski pass insurance would not provide coverage related to the COVID-19 resort closures.  *See* https://www.epicpass.com/info/epic-coverage.aspx (May 18, 2020 prior to this website page being updated) (stating: "We understand that as a result of the disruption caused by the COVID-19 pandemic, many of you may be feeling uncertain about your future plans.  **We also recognize that our passes, and Pass Insurance, historically have not provided refunds in situations like the COVID-19 pandemic.**" (emphasis added)).

110.    Through its public declaration that the COVID-19 related resorts closure was not covered under the Certificate, USIC has waived any notice requirements in the Certificate and/or any claim process identified in the Certificate.

111.    Regardless of these public statements that the closure of all Vail Resorts was not covered by ski pass insurance and the futility of filing individual claims, a number of Class members still completed the claim form and provided requested information to USIC through its authorized representative ACM, as identified in the Certificate, including providing any requested documentation to ACM within 90 days after the covered Loss occurred.

112.   Plaintiff Hoak is one of the Class members who submitted such a claim.  Attached as Exhibit B is ACM's April 10, 2020 letter acknowledging receipt of Ms. Hoak's claim ("Acknowledgement Letter").

113.   By separate letter also dated April 10, 2020, ACM provided Ms. Hoak with a "Coverage Position," which is attached as Exhibit C.  This letter states that ACM had "carefully reviewed the insurance policy referenced above as well as the factual basis of the presented claim" but was not making payment or recommending payment because it was still determining whether coverage exists.

114.   The Coverage Position sent by ACM further asserted as follows (emphasis in original):

> In review, the concern of contracting the virus may not be covered under peril (a) because it is not considered **Sickness**, as defined by the policy, unless your physician certifies you actually contracted the disease.  The policy may not provide you reimbursement for governmental authority(s) recommendation or to avoid, or bars travel, and/or "hold in place".

> Anxiety, depression, psychological disorders, etc., experienced due to concerns of the virus, travel restrictions imposed, causing the inability to use your pass could disqualify any reimbursement pursuant to **exclusion (d).**

> Further, Vail's decision to close their resorts due to the concern of COVID-19 may not be covered under peril (d) since the reason of the closure is not a **Natural Disaster** as that term is defined by the policy.

> In regard to peril (i), in the event a student's school closed early and the student returned home for on-line classes, it is possible no coverage exists for that cause of losing the ability to use the ski/snowboard season pass.

115.   The Coverage Position concluded by stating USIC's position as follows:

> At this time, a final coverage determination has not been made whether pass holders with insurance will receive a reimbursement.

116.   The Coverage Position failed to address and ignored altogether peril (e), which expressly provided coverage if the insured was "quarantined."

117.   Finally, in a May 7, 2020 "Denial Letter," attached hereto as Exhibit D, ACM informed Ms. Hoak that "[b]ased upon review of the Policy issued to you by USIC, we regret to inform you there is no coverage provided for your claims under the USIC Certificate of Season Ski Pass Insurance."

118.   The Denial Letter further asserted, in part, as follows (emphasis in original):

Your file was designated as one filed due to either Vail Resort's early closing of their North American Resorts, domestic, and international travel restrictions imposed due to the COVID-19 pandemic, or other reason(s), not including contraction of the virus, but associated with COVID-19.

…

The Policy does not provide reimbursement for governmental authority(s) recommendation to avoid and/or bars domestic travel, and/or "hold in place...

In further review, the concern of you or a family member contracting the virus is not covered under **peril (a)** because it is not "Sickness", as that term is defined by the Policy. In the event your "Physician" certified you or a family member contracted the disease, please have your "Physician" complete the medical form previously sent to you and return it to our office for our review and further determination of coverage.

In the event of quarantine, as mentioned by **peril (e)**, coverage may apply in the event you are diagnosed as having or suspected of having COVID-19. If you are quarantined, by "Physician's" orders, before March 15, 2020, provide us with your "Physician's" certification that your "Physician" placed you in quarantine. We will review the "Physician's" order to determine whether coverage applies.

Further, Vail Resorts' decision to close their resorts due to the concern of COVID-19 is not covered under **peril (d)** since the reason of the closure is not a "Natural Disaster" as defined by the Policy.

Please also note that anxiety, depression, psychological disorders, etc., experienced due to concerns of COVID-19, or travel restrictions imposed, causing the inability to use your pass will disqualify any reimbursement pursuant to **exclusion (d)**.

119. While the Denial Letter referenced the word "quarantine," it ignored the commonly understood meaning of the word and that Plaintiff and Class members were excluded from the resorts because of Vail Resorts' decision to suspend and then close the resorts to prevent COVID-19 from spreading.

120. Instead, the Denial Letter redefined the term and now required claimants to "provide us with your 'Physician's' certification that your 'Physician' placed you in quarantine," when the plain language of the ski pass insurance did not ever require any such physician's order for a claim based on quarantine.

121. Ms. Hoak exhausted USIC's claim process to no avail and, consistent with the Certificate's "Legal Action Against Us" provision, she is bringing this action against USIC.

122.     Ms. Hoak was denied coverage not based on any personal or individual reasons.  Her denial is consistent with public declarations made by USIC that it will not provide coverage in this situation, making the submission of additional claims to USIC by similarly situated Class members futile.

123.     USIC's denial is improper and in breach of the plain terms of the Certificate.

124.     Plaintiffs and other purchasers of USIC's pass insurance are entitled to coverage as a result of their exclusion from Vail Resorts due to the COVID-19 pandemic, but USIC has failed to make payment without just cause or excuse.

## **CLASS ACTION ALLEGATIONS**

125.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiffs bring this action on behalf of themselves and all others similarly situated and seek to represent the following Class: All persons in the United States who purchased ski pass insurance from USIC on their 2019/2020 Epic Pass(es).

126.     Excluded from the Class are USIC, any entity in which USIC has a controlling interest, any of the officers, directors, or employees of USIC, the legal representatives, heirs, successors, and assigns of USIC, anyone employed with Plaintiffs' counsels' firms, any Judge to whom this case is assigned, and his or her immediate family.

127.     Plaintiffs' claims satisfy the numerosity, typicality, adequacy, commonality and superiority requirements under Federal Rule of Civil Procedure 23, as set forth more fully herein.

128.     The persons who fall within the Class number in at least the hundreds, and most likely thousands, and thus the numerosity standard is satisfied.  Because Class members are geographically dispersed across the country, joinder of all Class members in a single action is impracticable.

129.     Class members are readily ascertainable from information and records in USIC's possession, custody, or control.  Notice of this action can readily be provided to the Class.

130.     There are questions of law and fact common to the claims of Plaintiffs and the Class that predominate over any questions affecting only individual Class members.  The questions of law and fact arising from USIC's actions that are common to the Class include, without limitation:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

a.   Whether the order and directive from Vail Resorts closing its resorts in the United States, and excluding Epic Pass holders from those resorts, constituted a Covered Peril, as a "quarantine," under the terms of USIC's ski pass insurance agreements;

b.   Whether orders and directives from the many governmental and health authorities throughout the United States, which restrained travel and excluded participation in certain activities due to the presence of COVID-19, constituted a Covered Peril, as a "quarantine," under the terms of USIC's ski pass insurance agreements;

c.   Whether Defendant breached the terms of its ski pass insurance agreements with Class members;

d.   Whether the Class sustained damages as a result of USIC's breaches of contract;

e.   Whether the Class is entitled to damages, restitution, and/or other equitable relief; and

f.   Whether the Class is entitled to declaratory relief stating the proper construction and/or interpretation of USIC's ski pass insurance agreement.

131.   The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein.

132.   Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs and the Class members all purchased ski pass insurance containing the same or similar terms including, in particular, what constitutes a Covered Peril.

133.   Plaintiffs will fairly and adequately protect and represent the interests of the proposed Class because their interests are aligned with, and not antagonistic to, those of the proposed Class.  They are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with class action litigation on behalf of purchasers of insurance policies.

134.   Maintenance of this action as a class action is a fair and efficient method for adjudicating this controversy.  It would be impracticable and undesirable for each member of the Class to bring a separate action.  Because of the relatively small size of an individual Class member's claims, absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

and would have no effective remedy. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

## COUNT I: BREACH OF CONTRACT

135. The preceding paragraphs are incorporated by reference as if fully alleged herein.

136. Plaintiffs and each member of the proposed Class purchased ski pass insurance from Defendant.

137. The ski pass insurance agreement, as evidenced by the Certificate, is a valid and enforceable contract between USIC and Plaintiffs and Class members.

138. Plaintiffs and Class members substantially performed their obligations under the terms of the ski pass insurance agreement.

139. Plaintiffs and Class members suffered a Loss from a Covered Peril because they could no longer use their Epic Passes.

140. USIC has failed to compensate Plaintiffs and Class members for their respective Losses as required by the ski pass insurance agreement. Plaintiffs and Class members were damaged because they are entitled to reimbursement of the pro-rated cost of the remaining portion of their Epic Passes, which Defendant has refused to pay pursuant to the terms of the Certificate.

141. As a direct and proximate result of USIC's breaches, Plaintiffs and the Class have sustained damages that are continuing in nature in an amount to be determined at trial.

## COUNT II: DECLARATORY RELIEF

142. The preceding paragraphs are incorporated by reference as if fully alleged herein.

143. An actual controversy has arisen and now exists between Plaintiffs and the Class, on the one hand, and USIC, on the other, concerning the respective rights and duties of the parties under the ski pass insurance agreement.

144. Plaintiffs contend that USIC has breached its agreement by failing to timely pay Class members for their respective Losses by reimbursing each member of the Class for the value of the Epic Pass cost as set forth in the ski pass insurance agreement.

145.     Plaintiffs, therefore, seek a declaration of the parties' respective rights and duties under the ski pass insurance agreement and request the Court to declare the aforementioned conduct of USIC unlawful and in material breach of the ski pass insurance agreement so that future controversies may be avoided.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request relief and judgment against USIC as follows:

(a)     For an order certifying the Class, appointing Plaintiffs as representatives of the Class, appointing Plaintiffs' counsel as Class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class;

(b)     For a judgment against USIC for the causes of action alleged against it;

(c)     For compensatory damages in an amount to be proven at trial;

(d)     For a declaration that USIC's conduct as alleged herein is unlawful and in material breach of its ski pass insurance agreement;

(e)     For pre-judgment and post-judgment interest at the maximum rate permitted by law;

(f)     For Plaintiffs' attorney's fees;

(g)     For Plaintiffs' costs and/or expenses; and

(h)     For such other relief in law or equity as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR

Dated: April 12, 2021          By:     /s/ Rachel Schwartz
                                        Rachel Schwartz (KS Bar # 21782)
                                        schwartz@stuevesiegel.com
                                        STUEVE SIEGEL HANSON LLP
                                        460 Nichols Road, Suite 200
                                        Kansas City, Missouri 64112
                                        Tel: 816-714-7100
                                        Fax: 816-714-7101

                                        John J. Schirger (MO Bar # 60583)
                                        jschirger@millerschirger.com
                                        MILLER SCHIRGER, LLC
                                        4520 Main Street, Suite 1570
                                        Kansas City, Missouri 64111
                                        Tel: 816-561-6500
                                        Fax: 816-561-6501

                                        *Plaintiffs' Co-Lead and Interim Class Counsel*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 4:20-MD-02975-YGR