UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UNITED SPECIALTY INSURANCE COMPANY SKI PASS INSURANCE LITIGATION<br><br>This Document Relates to All Actions | CASE NO. 20-md-02975-YGR<br><br>**ORDER GRANTING MOTION TO DISMISS**<br>Re: Dkt. No. 40 |

Currently pending in this multidistrict litigation is defendant United Specialty Insurance Company's ("USIC") motion to dismiss plaintiffs' Second Amended Consolidated Class Action Complaint ("SAC"). (Dkt. No. 40.) The SAC asserts counts for breach of contract and for declaratory relief. Having carefully considered the amended pleadings and the parties' briefing on the motion, the Court **GRANTS** the motion **WITH PREJUDICE**.

**I. BACKGROUND**

Plaintiffs purchased ski passes, or "Epic Passes," for access to the mountain resorts owned and/or operated by Vail Resorts for the 2019/2020 ski season. (SAC ¶¶ 6–8.) Along with the purchase of Epic Passes, plaintiffs also purchased ski pass insurance from defendant, which is the subject of this litigation. (*Id.*) The terms of the ski pass insurance purchased by plaintiffs are evidenced by the Certificate of Ski Season Ski Pass Insurance. (SAC ¶ 37, Ex. A ("Policy").)

The Certificate states in relevant part:

INSURING AGREEMENT: We will provide insurance under the Master Policy in consideration of your payment of the Premium.

EFFECTIVE DATE OF COVERAGE: This insurance will be effective immediately upon acceptance by us of the Premium and shall remain in effect until the last day of the Ski/Snowboard Season or the date upon which ski operations are ceased due to an unforeseen event, whichever is earlier.

PROPERTY INSURED AND COVERAGE LIMITS: We cover the Season Ski Pass Cost you paid. We cover you against the risk of not being able to use your Season Ski Pass due to a covered peril. We will reimburse you for the Season Ski

Pass Cost minus the applicable Daily Rate or Pro-Rata reduction (for the Epic Day Pass) for each day (or portion thereof) that you have used your Season Ski Pass during the Ski/Snowboard Season.

PERILS INSURED AGAINST: Subject to the Exclusions and Coverage Limits, the Insured has coverage against Loss of use of your Season Ski Pass if caused by any one of the following unforeseen perils occurring after the effective date of coverage:

\* \* \*

e) You are subpoenaed, required to serve on a jury, hijacked, *quarantined* or your travel visa is denied;

\* \* \*

TERMINATION OF INSURANCE: This insurance shall automatically terminate without notice to you on the last day of the Ski/Snowboard Season.

\* \* \*

(Policy (emphasis supplied).) Although the Certificate also contains a list of definitions, "quarantined" is not defined. (*See id.*)

On March 14, 2020, having "been closely tracking every new development related to coronavirus (COVID-19) and hav[ing] been in constant contact with local health officials for guidance," Vail Resorts announced it would "suspend the operations of all North American mountain resorts and retail stores beginning Sunday, March 15, 2020 through Sunday, March 22, 2020 and we use that time to reassess our approach for the rest of the season." (SAC ¶ 84.) That same day, the Governor of Colorado issued an executive order for the closure of downhill ski resorts "due to the presence of COVID-19 in the State of Colorado." (*Id.* ¶ 85.) On March 17, 2020, Vail Resorts made the decision to close its North American resorts for the entirety of the 2019/2020 season "amidst the continued challenges associated with the spread of coronavirus (COVID-19)." (*Id.* ¶ 88.)

Plaintiffs allege that "[a]s a result of the closure, which was intended to prevent the spread of the COVID-19 virus, [they] were excluded from entering upon and using the facilities of any of Vail Resorts' properties and deprived of the use of their Epic Passes." (*Id.* ¶ 99.) "Vail Resorts' decision to shut down its resort locations and exclude its passholders was a 'quarantine'—given

the commonly understood meaning of that term—as it was a measure aimed at restricting access of Epic Pass holders from publicly gathering at resort locations to prevent further spread of COVID-19." (*Id.* ¶ 100.) "Plaintiffs, who had intended to continue to make sure of their Epic Passes, were excluded from Vail Resorts when their Epic Passes still had value remaining." (*Id.* ¶ 101.) "As set forth in the Certificate, this was a Peril Insured Against by USIC and Plaintiffs are entitled to receive from USIC payment of the cost of their Epic Passes less the applicable 'Daily Rate' for each day that they used their Epic Passes during the ski/snowboarding season." (*Id.* ¶ 102.)

The Certificate provides that any notice of loss should be made to American Claims Management ("ACM") by mail, email, or by report online via smartphone or computer at https://www.acmclaims.com/secureforms2/claim/vail. (*Id.* ¶ 107.) That link previously opened a form that stated: "**There is no coverage under the insurance policy for Resort Closure. We suggest you go to the 2019/2020 Pass Holder Credit section of epicpass.com for more information prior to filing a claim.**" (*Id.* ¶ 108 (emphasis in original).) Vail Resorts informed Epic Pass purchasers that ski pass insurance would not provide coverage related to the COVID-19 resort closures. (*Id.* ¶ 109.) Notwithstanding, one plaintiff submitted a claim to ACM, which was ultimately denied. (*Id.* ¶¶ 112, 117–18.)

The denial letter stated, in pertinent part: "In the event of quarantine, as mentioned by **peril (e)**, coverage may apply in the event you are diagnosed as having or suspected of having COVID-19. If you are quarantined, by 'Physician's' orders, before March 15, 2020, provide us with your 'Physician's' certification that your 'Physician' placed you in quarantine. We will review the 'Physician's' order to determine whether coverage applies." (*Id.* ¶ 118.) Plaintiffs allege that the denial letter "ignored the commonly understood meaning of the word and that Plaintiff and Class Members were excluded from the resorts because of Vail Resorts' decision to suspend and then close the resorts to prevent COVID-19 from spreading." (*Id.* ¶ 119.)

According to plaintiffs, "'quarantine' is commonly understood to be associated with measures aimed at the restraint of activities of persons to prevent the spread of a disease," citing dictionary definitions, Wikipedia, publications, and federal statutes, among other sources. (*Id.* ¶

3

63; *see also id.* ¶¶ 57–78.) Plaintiffs therefore submit that they and "other purchasers of USIC's pass insurance are entitled to coverage as a result of their exclusion from Vail Resorts due to the COVID-19 pandemic." (*Id.* ¶ 124.) Having previously rejected this argument at the hearing on defendant's motion to dismiss the first amended class action complaint, the Court granted plaintiffs leave to file the SAC.

## II. LEGAL FRAMEWORK

### A. MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). A complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[W]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 678 (citing *Twombly,* 550 U.S. at 556).

### B. INSURANCE CONTRACT INTERPRETATION

Both sides assume in their briefs that California law governs the Policy. As such, the Court will deem both sides to have consented to the application of California law for purposes of this motion. Under California law, the "interpretation of an insurance policy is a question of law." *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1996). "While insurance contracts have special features, they are still contracts to which the ordinary rules of contract interpretation apply." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). The "goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions." *Minkler v. Safeco Inc.*, 49 Cal. 4th 315, 321 (2010)

4

(citing *Bank of the West*, 2 Cal. 4th at 1264)).

To determine the intent of the parties, courts "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it," reading the language in its "ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Waller*, 11 Cal. 4th at 18. An insurance policy "should be read as a lay[person] would read it and not as it might be analyzed by an attorney or an insurance expert." *Crane v. State Farm Fire & Cas. Co.*, 5 Cal. 3d 112, 115 (1971).

"If contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal. 4th at 1264. Said differently, "[i]f the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 666–67 (1995); *see also Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999) ("An insurance policy should be enforced as written when its terms are clear."). After all, "[a]n insurance company can choose which risks it will insure and which it will not, and coverage limitations set forth in a policy will be respected." *Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.*, 66 Cal. App. 4th 1080, 1086 (1998) (citing *Legarra v. Federated Mutual Ins. Co.*, 35 Cal. App. 4th 1472 (1995)).

However, if the policy language is ambiguous, the court "must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations." *Bank of the W.*, 2 Cal. 4th at 1265. A policy is ambiguous if it is "capable of two or more constructions, both of which are reasonable." *Waller*, 11 Cal. 4th at 18. The reasonable expectations inquiry "requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense.'" *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1058 (2002) (quoting *Bank of the W.*, 2 Cal. 4th at 1265).

"Only if this rule does not resolve a claimed ambiguity do [courts] resort to the rule that ambiguities are to be resolved against the insurer." *Bank of the West*, 2 Cal. 4th at 1265. That said, courts "will not strain to create an ambiguity where none exists or indulge in tortured constructions to divine some theoretical ambiguity in order to find coverage where none was contemplated." *Fireman's Fund Ins. Co. v. Superior Court.*, 65 Cal. App. 4th 1205, 1212–13

(1997) (citations omitted).

**III. ANALYSIS**

Defendant moves to dismiss this action on two grounds: first, the SAC fails to plead coverage under the Policy; and second, the SAC fails to plead that the claimed loss occurred while coverage was in effect. The Court begins with addressing the first issue. *See Rosen v. Nations Title Ins. Co.*, 56 Cal. App. 4th 1489, 1497 (1997) ("[T]he burden is on the insured to bring the claim within the basic scope of coverage."). If there is no contractual obligation for coverage, both causes of action for breach of contract and for declaratory relief fail and the second issue is moot.

Plaintiffs allege that coverage exists under peril (e) of the Policy, which provides:

PERILS INSURED AGAINST: Subject to the Exclusions and Coverage Limits, the Insured has coverage against Loss of use of your Season Ski Pass if caused by any one of the following unforeseen perils occurring after the effective date of coverage:

* * *

e) You are subpoenaed, required to serve on a jury, hijacked, quarantined or your travel visa is denied.

(Policy.) According to plaintiffs, "Vail Resorts' decision to shut down its resort locations and exclude its passholders was a 'quarantine'—given the commonly understood meaning of that term—as it was a measure aimed at restricting access of Epic Pass holders from publicly gathering at resort locations to prevent further spread of COVID-19." (SAC ¶ 100.) Defendant strenuously disputes plaintiffs' interpretation of the phrase "You are . . . quarantined," which, defendant argues, "means that the insured is detained or isolated from others because he or she has been potentially exposed to a communicable disease." (Mtn. at 10–11.)

The term "quarantined" is not defined in the Policy.[1] Nor does any party indicate that the term has a specialized or technical meaning. Therefore, the Court must interpret the Policy's use of the term "quarantined" in its ordinary and popular sense to determine whether a layperson reading the Policy would reasonably consider themselves to have been quarantined because they

---

[1] The absence of a definition does not itself create ambiguity. *See Bay Cities Paving & Grading Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 866 (1993).

6

were "excluded from the resorts" when they were closed to prevent COVID-19 from spreading, as plaintiffs allege. (SAC ¶ 119.)

The Court first turns to the dictionary to assess the plain meaning of the term "quarantined." *See Scott v. Cont'l Ins. Co.,* 44 Cal. App. 4th 24, 29 (1996) ("In seeking to ascertain the ordinary sense of words [in an insurance policy], courts in insurance cases regularly turn to general dictionaries."). The American Heritage Dictionary defines the transitive verb "quarantined" as "[t]o isolate in quarantine." American Heritage Dictionary Entry: quarantine, https://www.ahdictionary.com/word/search.html?q=quarantine (last visited Oct. 26, 2021). The same dictionary, in turn, defines the noun "quarantine" as "[a] condition, period of time, or place in which a person, animal, plant, vehicle, or amount of material suspected an infectious agent is kept in confinement or isolated in an effort to prevent disease from spreading"; "[a]n action resulting in such a condition: *the government's quarantine of the animals*"; "[a]n action to isolate another nation, such as a blockade of its ports or a severance of diplomatic or trade relations"; and "[t]he condition of being isolated by such an action." *Id.* Merriam-Webster defines the transitive verb "quarantined" as "to detain in or exclude by quarantine" or "to isolate from normal relations or communication." Merriam-Webster, Definition of Quarantine, https://www.merriam-webster.com/dictionary/quarantine (last visited Oct. 26, 2021). This dictionary, in turn, defines the noun "quarantine" as "a period of 40 days"; "a term during which a ship arriving in port and suspected of carrying contagious disease is held in isolation from the shore"; "a regulation placing a ship in quarantine"; "a place where a ship is detained during quarantine"; "a restraint upon the activities or communication of persons or the transport of goods designed to prevent the spread of disease or pests"; "a place in which those under quarantine are kept"; and "a state of enforced isolation."

Plaintiffs allege that quarantine can be achieved by two methods, detainment or exclusion, pointing to Merriam-Webster's definition "to detain in or exclude by quarantine." (SAC ¶ 64.) Focusing then on "quarantine by exclusion," plaintiffs seize on Merriam-Webster's other definition for quarantine as "a restraint upon the activities or communication of persons . . . designed to prevent the spread of disease" to argue that "restricting access to areas where

7

individuals may otherwise have the right to publicly gather is a 'quarantine.'" (*Id.*) However, as recognized by the California Supreme Court, a basic fallacy in policy interpretation results from cherry-picking dictionary meanings or claiming the "policy language is to be discovered by citing one of the dictionary meanings of key words[.]" *See MacKinnon v. Truck Ins. Exchange,* 31 Cal. 4th 635, 649 (2003). "Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context." *Id.* (citing *Bank of the West,* 2 Cal. 4th at 1265).

Turning then to the Policy itself, the Court considers the term "quarantined" in context. *See McMillin Mgmt. Servs., L.P. v. Fin. Pac. Ins. Co.*, 17 Cal. App. 5th 187, 201 (2017) ("[Courts] must also 'interpret the language in context, with regard to its intended function in the policy.'") (quoting *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 288 (2014)). Peril (e) states in its entirety: "You are subpoenaed, required to serve on a jury, hijacked, quarantined or your travel visa is denied." An individual subject to any one of these conditions is compelled to stay near or within a particular area and therefore *is tethered to some location*.

In light of the surrounding terms in the relevant policy language, plaintiff's argument that quarantine encompasses any measure whatsoever that restricts access to a particular area to prevent the spread of a disease, while creative, defies common sense. By plaintiffs' logic, mask and vaccine mandates, physical distancing requirements, capacity limits, or any other public health measure that cordons off a physical space effectuates a quarantine. Courts "do not abandon common sense when reading an insurance policy." *See Mitroff v. United Servs. Auto. Ass'n*, 72 Cal. App. 4th 1230, 1239 (1999). Thus, the Court is unwilling to accord undue weight to the dictionary definition of quarantine highlighted by plaintiffs.[2]

---

[2] In addition to dictionary definitions, the SAC cites numerous, yet far-reaching materials to support their argument that a common or ordinary understanding of quarantine includes exclusion from a business for purposes of disease prevention. (SAC ¶¶ 56–78.) These materials include Wikipedia, a compilation of public health laws published in 1925, law review articles about geographic quarantines, publications issued by public health agencies, federal and state regulations, statements by former New York Governor Andrew Cuomo, and an assortment of online articles. The SAC quotes selected excerpts from these materials, none of which persuades the Court that a layperson would consider themselves quarantined by virtue of a business closure.

Instead, the other possible dictionary definitions, the context of the Policy, and common sense collectively reveal what is missing from plaintiffs' proposed construction of the term "quarantined": a notion of containment, or simply staying put. While individuals whose movements are limited to a designated area are inherently excluded from every other place beyond that location, it does not follow that exclusion from a single location in the name of public health necessarily constitutes a quarantine. This is because the shutdown of one site does not prevent a would-be visitor from otherwise moving about freely. Such a person hardly can be said to be quarantined. Therefore, plaintiffs' proposed construction of the term "quarantined," which fixates on exclusion, misses the point of a quarantine entirely.

Interpreting the Policy with the assistance of dictionary definitions, surrounding terms, and common sense, the Court concludes that plaintiff's expansive definition of "quarantined" to include any measure excluding individuals from a particular area to prevent the spread of disease, without any other restriction, is patently unreasonable.[3] The Court finds instead that, at minimum, the meaning of quarantine encompasses a *limitation* of movement *to a particular area*, a meaning which is clear and unambiguous. Further, the language reflects a condition which applies to the person. For instance, jury duty is required but whether a person is specifically called to served, and therefore triggering the provision is a separate inquiry.

Under principles of California law, an ambiguity may not be created by adopting a strained or absurd interpretation. *See Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 807 (1982) ("Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none

---

[3] *See also In re Arch Ins. Co Ski Pass Ins. Litig.*, No. 20-MD-2955 (BCW), 2021 WL 4191464, at *6–8 (W.D. Mo. Sept. 8, 2021) (rejecting argument that plaintiffs were "quarantined" "when they could not use their ski passes due to government restrictions on travel and activities"), *appeal pending*, No. 21-3087 (8th Cir.); *DePasquale v. Nationwide Mutual Ins. Co.*, No. 20-5370 (SDM), 2021 WL 1815078, at *6 ("COVID-19 Civil Authority Orders and Travel Advisories do not impose isolation, and are not quarantine orders."), *appeal pending*, No. 21-3467 (6th Cir.); *but see Gordon v. Arch Ins. Co.*, No. 21-CV-1911 (GAM), 2021 WL 2186392, at *2 (E.D. Pa. May 28, 2021) (denying motion to dismiss as to breach of contract claim for insurance coverage based on disputed definition of "quarantine" because "even though the meaning of the word 'quarantine' is a legal question, ascertaining when government orders were instituted by state and national government in the United States and in Europe, and the extent to which they restricted individual movement, is a factual inquiry that will shed light on the question").

exists."). Although plaintiffs are correct that any ambiguities must be resolved against the insurer, "[t]his rule of construction is applicable only when the policy language is found to be unclear." *Am. Int'l Underwriters Ins. Co. v. Am. Guarantee & Liability Ins. Co.*, 181 Cal. App. 4th 616, 629 (2010) (citing *Amex Assur. Co. v. Allstate Ins. Co.*, 112 Cal. App. 4th 1246, 1251 (2008)). Here, it is not. Accordingly, having failed to allege plausible coverage under the Policy, plaintiffs cannot state a claim upon which relief can be granted.

In light of this conclusion, the Court need not reach defendant's alternative argument that coverage was no longer in effect at the time of the alleged losses as it would be advisory only.

### IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED WITH PREJUDICE**, and judgment shall be entered in favor of defendant.

This Order terminates the case.

**IT IS SO ORDERED.**

Dated: October 26, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**